## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**Case No.:** _____

GOVERNMENT EMPLOYEES
INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

      Plaintiffs,

vs.

CARLOS E. FOSSI, M.D., RELIEF
AND REHAB, INC. F/K/A DEL SOL
CARE & REHAB CENTER, INC.,
ALEXIS DEL SOL PEREZ, L.M.T.,
RENEW HEALTH CENTER LLC
F/K/A BAYCARE HEALTH CENTER,
LLC, YSMARY DIAZ, L.M.T.,
YOSBANY PEREZ GONZALEZ,
YADIEL PEREZ DIAZ, TAMPA BAY
THERAPY CARE, INC., DALIN
CARRILLO, and KAYLA SERRA,

      Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co.,

GEICO General Insurance Company, and GEICO Casualty Co. (collectively

"GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1.    This action seeks to recover more than $3,700,000.00 that Defendants

wrongfully obtained from Plaintiffs by submitting thousands of fraudulent and

unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Relief and Rehab, Inc. f/k/a Del Sol Care & Rehab Center, Inc. ("Del Sol Care"), Renew Health Center LLC f/k/a Baycare Health Center, LLC ("Renew Health"), and Tampa Bay Therapy Care, Inc. ("Tampa Bay Therapy") (collectively the "Fossi Clinics") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including purported examinations and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO PIP insurance policies ("Insureds").

2.      In addition, Plaintiffs seek a declaration that they are not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent and unlawful PIP claims that the respective Defendants have submitted through Del Sol Care, Renew Health, and Tampa Bay Therapy, because of the fraudulent and unlawful activities described herein.

3.      As set forth herein, Defendants never were entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs, because:

   (i)      at all relevant times, Defendants operated in violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); and (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering Defendants' PIP insurance charges noncompensable and unenforceable;

2

(ii)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the insureds who purportedly received and were subjected to the Fraudulent Services;

(iii)   in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)   Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)    Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and the billing was submitted in violation of the requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

4.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO.

5.      Defendants at all relevant times have known that they were not entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs because of the fraudulent and unlawful activities described herein.

6.      The charts attached hereto as Exhibits "1" - "3" set forth large and representative samples of the fraudulent and unlawful claims that have been identified to date that Defendants submitted through Del Sol Care, Renew Health, and Tampa Bay Therapy to GEICO by mail.

7.      Defendants' interrelated fraudulent and unlawful schemes began no later than 2020, and have continued uninterrupted since that time. As a result of

Defendants' fraudulent and unlawful schemes, GEICO has incurred damages of more than $3,700,000.00.

**THE PARTIES**

**I.     Plaintiffs**

8.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

**II.     Defendants**

9.     Defendant Carlos E. Fossi, M.D. ("Fossi") resides in and is a citizen of Florida. Fossi graduated from medical school in 1967, and was licensed to practice medicine in Florida in 1987. Fossi falsely purported to serve as medical director at Del Sol Care between April 2022 and the present, Renew Health between December 2017 and the present, and Tampa Bay Therapy between October 2022 and the present, and used Del Sol Care, Renew Health, and Tampa Bay Therapy as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers. Upon information and belief based on publicly-available records, Fossi is approximately 81 years-old.

10.     Defendant Del Sol Care is a Florida corporation with its principal place of business in Tampa, Florida. Del Sol Care was originally incorporated in October 2020 under the name Del Sol Care & Rehab Center Inc, had Alexis Del Sol Perez,

4

L.M.T. ("Del Sol Perez") as its owner from October 2020 to April 2025, and has had Ariannis Suarez-Sanchez ("Suarez-Sanchez") as its owner from April 2025 to the present.

11. At all relevant times, Del Sol Care falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but that in fact was not operated in compliance with the Clinic Act, and instead was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12. Defendant Del Sol Perez resides in and is a citizen of Florida. Del Sol Perez owned and controlled Del Sol Care from October 2020 through April 2025, and used Del Sol Care as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

13. Defendant Renew Health is a Florida limited liability company with its principal place of business in Tampa, Florida. Renew Health was originally organized in April 2011 under the name Massage Specialist & Rehab Center LLC. Thereafter, its name was changed to Rehab Specialty Center LLC in January 2017, then to Bay Care Health Center LLC in June 2021, and then to Renew Health Center LLC in November 2024. Renew Health had Ysmaray Diaz, L.M.T. ("Diaz") as its owner and member from May 2017 to September 2021, had Diaz and Yosbany Perez Gonzalez ("Perez Gonzalez") as its owners and members from September 2021 to October 2023, and has had Perez Gonzalez and Yadiel Perez Diaz ("Perez Diaz") as its owners and members from October 2023 to the present.

14.     At all relevant times, Renew Health falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but that in fact was not operated in compliance with the Clinic Act, and instead was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

15.     Defendant Diaz resides in and is a citizen of Florida. Diaz owned and controlled Renew Health from May 2017 through October 2023, and used Renew Health as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

16.     Defendant Perez Gonzalez resides in and is a citizen of Florida. Perez Gonzalez owned and controlled Renew Health from September 2021 through the present, and used Renew Health as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17.     Defendant Perez Diaz resides in and is a citizen of Florida. Perez Gonzalez owned and controlled Renew Health from October 2023 through the present, and used Renew Health as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

18.     Defendant Tampa Bay Therapy is a Florida corporation with its principal place of business in Tampa, Florida. Tampa Bay Therapy was incorporated in July 2022, and had Dalin Carrillo ("Carrillo") and Kayla Serra ("Serra") as its owners from June 2023 through the present.

6

19.     At all relevant times, Tampa Bay Therapy falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but that in fact was not operated in compliance with the Clinic Act, and instead was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

20.     Defendant Carrillo resides in and is a citizen of Florida. Carrillo owned and controlled Tampa Bay Therapy from July 2022 to the present, and used Tampa Bay Therapy as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

21.     Defendant Serra resides in and is a citizen of Florida. Serra owned and controlled Tampa Bay Therapy from July 2022 to the present, and used Tampa Bay Therapy as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

III.    **Other Relevant Individuals**

22.     Although not presently named as Defendants in this action, Ricardo Ramos, D.C. ("Ramos"), Elizabeth Leon, A.P.R.N. ("Leon"), Eduardo Fonseca, A.P.R.N. ("Fonseca"), Jesus Reales, M.D. ("Reales"), Oded Shechter, M.D. ("Shechter"), Thomas Gionis, M.D. ("Gionis"), and Suarez-Sanchez are also relevant to understanding Plaintiffs' claims in this action.

23.     Ramos was licensed to practice chiropractic in Florida on July 12, 2002, was employed by or associated with Del Sol Care, and purported to perform

Fraudulent Services on behalf of Del Sol Care, at the direction of Del Sol Care, Fossi, and Del Sol Perez.

24.    Ramos has a history of involvement in PIP insurance fraud schemes. For instance, in July 2025, Ramos was convicted in the United States District Court for the Middle District of Florida on a charge of conspiracy to commit money laundering in connection with a PIP fraud scheme in which he was involved, and is currently awaiting sentencing.

25.    Leon was licensed as an advanced practice registered nurse in Florida on November 30, 2021, was employed by or associated with Renew Health, and purported to perform Fraudulent Services on behalf of Renew Health, at the direction of Renew Health, Fossi, Diaz, Perez Gonzalez, and Perez Diaz.

26.    Fonseca was licensed as an advanced practice registered nurse in Florida on January 10, 2023, was employed by or associated with Tampa Bay Therapy, and purported to perform Fraudulent Services on behalf of Tampa Bay Therapy, at the direction of Tampa Bay Therapy, Fossi, Carrillo, and Serra.

27.    Gionis was first licensed to practice medicine in Florida on September 13, 1976, and purported to serve as medical director at Del Sol Care from December 2020 to April 2021.

28.    Reales was licensed to practice medicine in Florida on August 18, 2004, and purported to serve as medical director at Del Sol Care from April 2021 to December 2021.

29.     Shechter was licensed to practice medicine in Florida on August 19, 1982, and purported to serve as medical director at Del Sol Care from January 2022 to April 2022.

30.     Suarez-Sanchez resides in and is a citizen of Florida. Suarez-Sanchez owned and controlled Del Sol Care from April 2025 to the present.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

32.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

33.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

34.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.    Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

35.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

36.    Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

37.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

38.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

39.    Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and

administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

40.    Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

41.    Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician as medical director or clinic director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

42.    Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

43.    In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

44.    Moreover, a clinic medical director must serve as the records owner for the clinic, and – in that capacity – must, among other things: (i) develop and implement

policies, standards, and procedures to protect the confidentiality and security of patient records at the clinic; (ii) ensure that clinic employees are trained in such policies, standards, and procedures; and (iii) be responsible for maintaining a record of all disclosures of information contained in clinic patients' medical records to third parties, including the purpose of the disclosure requests.

45.    Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

46.    Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

47.    Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

48.    Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or

12

failing to make a good-faith effort to collect, co-payments or deductibles from patients with PIP insurance.

49.    Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

50.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

51.    Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)    in accordance with generally accepted standards of medical practice;

(b)    clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)    not primarily for the convenience of the patient, physician, or other health care provider.

52.    Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

53.    However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

54.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

55.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

56.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

57.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current

14

procedural terminology ("CPT") codes.

58.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

59.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

60.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

61.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

II.     **The Defendants' Interrelated Fraudulent and Unlawful Schemes**

62.     Since at least 2020, and continuing through the present day, the Defendants devised and implemented interrelated fraudulent and unlawful schemes

15

pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

63.    In the claims identified in Exhibits "1" - "3", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor automobile accidents they experienced that would necessitate the treatments that the Defendants purported to provide.

64.    Even so, in the claims identified in Exhibits "1" - "3", the respective Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that the Defendants could submit to insurers – including GEICO – rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to this "treatment".

65.    The Defendants provided their pre-determined and fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "3" without regard for the Insureds' individual symptoms or presentation – or, in most cases, the total absence of any significant continuing medical problems arising from any actual automobile accidents.

66.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

16

67.    No legitimate physician, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described herein to proceed under their auspices.

68.    The Defendants permitted the fraudulent treatment and billing protocols described herein to proceed under their auspices because: (i) the Fossi Clinics were, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight and without medical directors who legitimately fulfilled their statutory duties as medical directors; and (ii) the Defendants sought to profit from the fraudulent and unlawful billing that they submitted through the respective Fossi Clinics to GEICO and other insurers.

**A.    The Defendants' Fraudulent and Unlawful Billing for Physical Therapy Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals, and Misrepresentations Regarding the Identities of the Actual Treating Practitioners**

69.    As part of their fraudulent and unlawful billing schemes, the Defendants almost always purported to subject the Insureds in the claims identified in Exhibits "1" - "3" to months of medically unnecessary "physical therapy" treatments, which the Defendants then fraudulently and unlawfully billed to GEICO.

70.    As set forth in Exhibits "1" – "3", the purported "physical therapy" services constituted the substantial majority of the services that the Defendants billed through the respective Fossi Clinics to GEICO.

71.    In the claims for "physical therapy" services identified in Exhibits "1" – "3", the services unlawfully were performed – to the extent that they were performed

at all – by unlicensed and unsupervised individuals, and by massage therapists, including, but not limited to, individuals named Nayade Alfonso, L.M.T. ("Alfonso"), Greisys Cuellan, L.M.T. ("Cuellan"), Nelson Caballero, L.M.T. ("Caballero"), Idania Hernandez Iznaga, L.M.T. ("Iznaga"), Diaz, and Gretel Hernandez, L.M.T. (Hernandez").

72.   In particular, Alfonso was employed by or associated with Del Sol Care, and purported to perform many of the Fraudulent Services at Del Sol Care.

73.   Cuellan was employed by or associated with Del Sol Care, and purported to perform many of the Fraudulent Services at Del Sol Care.

74.   Diaz owned Renew Health, and purported to perform many of the Fraudulent Services at Renew Health.

75.   Hernandez was employed by or associated with Renew Health, and purported to perform many of the Fraudulent Services at Renew Health.

76.   Caballero was employed by or associated with Tampa Bay Therapy, and purported to perform many of the Fraudulent Services at Tampa Bay Therapy.

77.   Iznaga was employed by or associated with Tampa Bay Therapy, and purported to perform many of the Fraudulent Services at Tampa Bay Therapy.

78.   The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by massage therapists or unsupervised/unlicensed individuals.

79.   As a result, and in order to conceal the fact that Alfonso, Cuellan, Diaz, Hernandez,   Caballero,   Iznaga,   and   other   massage   therapists   and

18

unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through the Fossi Clinics to GEICO, the Defendants deliberately omitted any reference to Alfonso, Cuellan, Diaz, Hernandez, Caballero, Iznaga, and other massage therapists and unlicensed/unsupervised individuals associated with the Fossi Clinics on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

80.      Instead, in the claims for physical therapy services identified in Exhibit "1", Del Sol Care, Del Sol Perez, and Fossi routinely and falsely listed Ramos in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

81.      In the claims for physical therapy services identified in Exhibit "2", Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi routinely and falsely listed Fossi in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

82.      In the claims for physical therapy services identified in Exhibit "3", Tampa Bay Therapy, Carrillo, Serra, and Fossi routinely and falsely listed Fonseca in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

83.      In fact, Ramos, Fossi, and Fonseca – who on individual dates were simultaneously purporting to perform or directly supervise an impossible number of physical therapy and other services, and oftentimes at multiple locations on individual dates – did not legitimately perform or directly supervise the physical therapy services

in the claims identified in Exhibits "1" - "3", and could not have legitimately performed or directly supervised the physical therapy services.

84.   For example:

(i)   On May 2, 2022, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 3.75 hours of services provided to two different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 25 hours of services purportedly provided to 15 additional Insureds at a different clinic called Hillsborough Therapy Center, Inc. ("Hillsborough Therapy"). In all, GEICO received billing for at least 28.75 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on May 2, 2022.

(ii)   On May 4, 2022, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 3.5 hours of services provided to two different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 30.75 hours of services purportedly provided to 20 additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 34.25 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on May 4, 2022.

(iii)   On May 23, 2022, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 3.75 hours of services provided to two different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 33.75 hours of services purportedly provided to 22 additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 37.5 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on May 23, 2022.

(iv)   On June 8, 2022, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 8.25 hours of services provided to five different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 41 hours of services purportedly provided to 22 additional

Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 49.25 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on June 8, 2022.

(v)     On July 22, 2022, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 17.5 hours of services provided to nine different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 7.25 hours of services purportedly provided to five additional Insureds at a different clinic called Sunrise Injury Center, LLC ("Sunrise Injury"). In all, GEICO received billing for at least 21.75 hours of services that Ramos purported to personally perform, or at least directly supervise, at two separate locations on July 22, 2022.

(vi)    On July 27, 2022, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 4.75 hours of services provided to two different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 24 hours of services purportedly provided to 15 additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 28.75 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on July 27, 2022.

(vii)   On August 18, 2022, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 1.75 hours of services provided to one Insured, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 39.75 hours of services purportedly provided to 25 additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 41.5 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on August 18, 2022.

(viii)  On September 21, 2022, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 14.5 hours of services provided to 13 different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 23.25 hours of services purportedly provided to 14 additional Insureds at Sunrise Injury. In all, GEICO received billing for at least 37.75 hours of services that Ramos purported to personally perform, or

at least directly supervise, at two separate locations on September 21, 2022.

(ix)    On September 27, 2022, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 12.75 hours of services provided to 10 different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 21.25 hours of services purportedly provided to 14 additional Insureds at Sunrise Injury. In all, GEICO received billing for at least 34 hours of services that Ramos purported to personally perform, or at least directly supervise, at two separate locations on September 27, 2022.

(x)    On October 10, 2022, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 32 hours of services provided to 23 different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 14.75 hours of services purportedly provided to nine additional Insureds at Sunrise Injury. In all, GEICO received billing for at least 46.75 hours of services that Ramos purported to personally perform, or at least directly supervise, at two separate locations on October 10, 2022.

(xi)    On December 16, 2022, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 3.75 hours of services provided to three different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 19.25 hours of services purportedly provided to 10 additional Insureds at Sunrise Injury. In all, GEICO received billing for at least 23 hours of services that Ramos purported to personally perform, or at least directly supervise, at two separate locations on December 16, 2022.

(xii)    On December 19, 2022, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 10.5 hours of services provided to three different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 22.5 hours of services purportedly provided to 12 additional Insureds at Sunrise Injury. In all, GEICO received billing for at least 33 hours of services that Ramos purported to personally perform, or at least directly supervise, at two separate locations on December 19, 2022.

(xiii)  On January 30, 2023, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than three hours of services provided to two different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 26.5 hours of services purportedly provided to 14 additional Insureds at Sunrise Injury. In all, GEICO received billing for at least 29.5 hours of services that Ramos purported to personally perform, or at least directly supervise, at two separate locations on January 30, 2023.

(xiv)  On June 7, 2023, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than 10.75 hours of services provided to eight different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 14.25 hours of services purportedly provided to nine additional Insureds at Hillsborough Therapy Center, Inc. In all, GEICO received billing for at least 25 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on June 7, 2023.

(xv)  On June 15, 2023, Renew Health, Diaz, Perez Gonzalez, and Fossi billed GEICO for more than five hours of services provided to five different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 30 hours of services purportedly provided to 13 additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 35 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on June 15, 2023.

(xvi)  On October 6, 2023, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 23.5 hours of services provided to 12 different Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xvii)  On October 10, 2023, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 26.25 hours of services provided to 14 different Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xviii) On October 24, 2023, Renew Health, Perez Diaz, Perez Gonzalez, and Fossi billed GEICO for more than five hours of services provided to three different Insureds, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 30 hours of services purportedly provided to 14 additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 35 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on October 24, 2023.

(xix) On February 12, 2024, Renew Health, Perez-Diaz, Perez Gonzalez, and Fossi billed GEICO for more than two hours of services provided to one Insured, and falsely represented in the billing that Fossi had performed or at least directly supervised all of them. That same day, Fossi also purported to personally perform, or at least directly supervise, an additional 19.75 hours of services purportedly provided to eight additional Insureds at Hillsborough Therapy. In all, GEICO received billing for at least 21.75 hours of services that Fossi purported to personally perform, or at least directly supervise, at two separate locations on February 12, 2024.

(xx) On March 7, 2024, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 6.25 hours of services provided to three different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 51.75 hours of services purportedly provided to 34 additional Insureds at other clinics called Best Care Medical Group, Inc. ("Best Care"), Guardian Angel Health Services, Inc. ("Guardian Angel"), Palm Wellness Center, LLC ("Palm Wellness"), Robust Pain and Wellness Medical Center, Inc. ("Robust Pain"), Serenity Medical Rehab, Inc. ("Serenity Medical"), and Sunrise Injury. In all, GEICO received billing for at least 58 hours of services that Ramos purported to personally perform, or at least directly supervise, at six separate locations on March 7, 2024.

(xxi) On March 11, 2024, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 4.25 hours of services provided to three different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 44.25 hours of services purportedly provided to 30 additional Insureds at Best Care, Guardian Angel, Palm Wellness, Robust Pain, Serenity Medical, and Sunrise Injury. In all, GEICO received billing for

at least 48.5 hours of services that Ramos purported to personally perform, or at least directly supervise, at seven separate locations on March 11, 2024.

(xxii)  On March 25, 2024, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for more than 4.25 hours of services provided to three different Insureds, and falsely represented in the billing that Ramos had performed or at least directly supervised all of them. That same day, Ramos also purported to personally perform, or at least directly supervise, an additional 28.5 hours of services purportedly provided to 19 additional Insureds at Guardian Angel, Palm Wellness, Robust Pain, Serenity Medical, and Sunrise Injury. In all, GEICO received billing for at least 32.75 hours of services that Ramos purported to personally perform, or at least directly supervise, at six separate locations on March 25, 2024.

(xxiii) On May 28, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 30.25 hours of services provided to 16 Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxiv) On May 30, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 32.75 hours of services provided to 18 Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxv)  On June 3, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 34.75 hours of services provided to 18 Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxvi) On June 11, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 22 hours of services provided to 12 Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxvii) On September 4, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 44.25 hours of services provided to 24 insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxviii) On October 30, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 34.75 hours of services provided to 17

Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxix) On November 12, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 37 hours of services provided to 17 Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

(xxx) On November 19, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for more than 27.25 hours of services provided to 15 Insureds, and falsely represented in the billing that Fonseca had performed or at least directly supervised all of them.

85. These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" – "3", the respective Defendants routinely falsely represented that Ramos, Fossi, and Fonseca had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates.

86. It is impossible that Ramos and Fossi – who were simultaneously working at or purporting to perform or directly supervise various other medical practices and clinics – routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

87. Similarly, it is equally impossible that Fonseca routinely performed or directly supervised such a high volume of services on individual dates at Tampa Bay Therapy.

88. In keeping with the fact that Fossi did not perform or directly supervise the services that were billed through Renew Health to GEICO, Renew Health's 2021 and 2023 AHCA clinic licensing applications – which were submitted under penalties

of perjury – represented that Fossi was only at the clinic one day per month, and that Fossi did not perform health care services at the clinic.

89.     Furthermore, upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

90.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

91.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO and that they did not simultaneously bill other automobile insurers.

92.     Thus, upon information and belief, the impossible number of physical therapy services that Ramos, Fossi, and Fonseca purported to directly supervise or provide to GEICO Insureds at the Fossi Clinics – and other clinics on individual dates of service, including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy services that Ramos, Fossi, and Fonseca purported to perform or directly supervise on those same dates of service.

93.     In the claims for "physical therapy" services identified in Exhibits "1" – "3", the Defendants routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii)    the Fossi Clinics could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unsupervised/unlicensed individuals, and because the clinics operated in violation of Florida law; and

(iii)   the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

94.     In this context, Fossi – who purported to be the medical director at the respective Fossi Clinics – did not, and could not have, legitimately served as medical director of each of the clinics.

95.     Had Fossi legitimately served as the medical director of the Fossi Clinics, he would have noted – among other things – that the physical therapy services provided at each of the Fossi Clinics were unlawfully performed by massage therapists and unsupervised/unlicensed individuals, and unlawfully billed to GEICO, and would have taken immediate corrective action.

**B.      The Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect Co-Payments or Deductibles from Their Patients**

96.     The Defendants knew that, if they made a legitimate, good-faith effort to collect deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful schemes described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Fossi Clinics' offices for medically unnecessary treatment.

97. Accordingly, as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

98. In keeping with this fact, in almost all of the thousands of bills (i.e., the HCFA-1500 forms) submitted to GEICO through the respective Fossi Clinics for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patients.

99. In the claims identified in Exhibits "1" - "3", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

100. In this context, Fossi – who purported to be the medical director at each of the Fossi Clinics – did not, and could not have, legitimately systematically reviewed the Fossi Clinics' billings to ensure that they were neither fraudulent nor unlawful.

101. Had Fossi legitimately systematically reviewed the Fossi Clinics' billings to ensure that they were neither fraudulent nor unlawful, he would have noted – among other things – that each of the Fossi Clinics unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-

payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute, and he would have taken immediate corrective action.

## C.   The Defendants' Fraudulent Treatment and Billing Protocols

### 1.   The Defendants' Fraudulent and Unlawful Charges for Initial Examinations

102.   As a first step in the Defendants' fraudulent treatment and billing protocols, almost every Insured identified in Exhibits "1" – "3" purportedly received an initial examination at the Fossi Clinics.

103.   As set forth in Exhibit "1", Del Sol Care, Del Sol Perez, and Fossi then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in a charge of $260.00 for each initial examination that they purported to provide.

104.   As set forth in Exhibit "2", Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, typically resulting in a charge of $350.00 for each initial examination that they purported to provide.

105.   As set forth in Exhibit "3", Tampa Bay Therapy, Carrillo, Serra, and Fossi then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in a charge of $250.00 for each initial examination that they purported to provide.

106.   In the claims for initial examinations identified in Exhibits "1" - "3", the charges for initial examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

107.   In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, inasmuch as they operated the respective Fossi Clinics in violation of Florida law.

108.   Moreover, and as set forth herein, the charges for initial examinations identified in Exhibits "1" - "3" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

### a.   Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

109.   As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

110.   The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

111.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically represents that the patient presented for the examination with problems of moderate severity.

112.   The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, including:

(i)   Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)   Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)   Initial office visit for evaluation of a 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)   Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

113.   Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

114.   Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination typically represents that an insured presented for the examination with problems of moderate to high severity.

115.   The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

(i)   Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)   Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)   Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

32

(v)    Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)    Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

116.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

117.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" - "3" had any presenting problems at all as the result of their typically minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

118.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" - "3" either had no presenting problems at all as the result of their minor automobile accidents, or else had problems of minimal severity, in most of the claims identified in Exhibits "1" - "3", the Insureds did not seek treatment at any hospital as the result of their accidents.

119.    To the limited extent that the Insureds in the claims identified in Exhibits "1" - "3" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and were discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

33

120.    Furthermore, in many of the claims identified in Exhibits "1" - "3" and "5", the contemporaneous police reports indicate that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

121.    Even so, in the claims for initial examinations identified in Exhibits "1" - "3", the respective Defendants routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity and moderate to high severity, respectively.

122.    For example:

(i)     On April 2, 2022, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured as a result of the accident. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of MR by Leon on April 7, 2022, Renew Health, Perez Gonzalez, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ii)    On May 26, 2022, an Insured named OH was involved in an automobile accident. The contemporaneous police report indicated that OH's vehicle was drivable following the accident. The police report further indicated that OH was not injured as a result of the accident. In keeping with the fact that OH was not seriously injured, OH did not visit any hospital emergency room following the accident. To the extent that OH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of OH by Leon on June 6, 2022, Renew Health, Perez Gonzalez, and Fossi billed GEICO for the initial examination using CPT code 99204,

34

and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(iii)    On February 8, 2023, an Insured named FC was involved in an automobile accident. The contemporaneous police report indicated that FC's vehicle was drivable following the accident. The police report further indicated that FC was not injured as a result of the accident. In keeping with the fact that FC was not seriously injured, FC did not visit any hospital emergency room following the accident. To the extent that FC experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of FC by Leon on February 14, 2023, Renew Health, Perez Gonzalez, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(iv)    On April 15, 2023, an Insured named RZ was involved in an automobile accident. The contemporaneous police report indicated that RZ's vehicle was drivable following the accident. The police report further indicated that RZ was not injured as a result of the accident. In keeping with the fact that RZ was not seriously injured, RZ did not visit any hospital emergency room following the accident. To the extent that RZ experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of RZ by Leon on April 18, 2023, Renew Health, Perez Gonzalez, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(v)    On April 19, 2023, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured as a result of the accident. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of MM by Ramos on April 25, 2023, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(vi)     On July 1, 2023, an Insured named YB was involved in an automobile accident. The contemporaneous police report indicated that YB's vehicle was drivable following the accident. The police report further indicated that YB was not injured as a result of the accident. In keeping with the fact that YB was not seriously injured, YB did not visit any hospital emergency room following the accident. To the extent that YB experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of YB by Ramos on July 6, 2023, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(vii)    On December 8, 2023, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured as a result of the accident. In keeping with the fact that IR was not seriously injured, IR did not visit any hospital emergency room following the accident. To the extent that IR experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of IR by Ramos on January 11, 2024, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(viii)   On February 5, 2024, an Insured named VH was involved in an automobile accident. The contemporaneous police report indicated that VH's vehicle was drivable following the accident. The police report further indicated that VH was not injured as a result of the accident. In keeping with the fact that VH was not seriously injured, VH did not visit any hospital emergency room following the accident. To the extent that VH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of VH by Leon on February 6, 2024, Renew Health, Perez Gonzalez, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ix)     On February 12, 2024, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR was not injured as a result of the accident. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital

emergency room following the accident. To the extent that AR experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AR by Fonseca on February 13, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(x)     On February 25, 2024, an Insured named GG was involved in an automobile accident. The contemporaneous police report indicated that GG's vehicle was drivable following the accident. The police report further indicated that GG was not injured as a result of the accident. In keeping with the fact that GG was not seriously injured, GG did not visit any hospital emergency room following the accident. To the extent that GG experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of GG by Ramos on February 26, 2024, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(xi)    On March 27, 2024, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured as a result of the accident. In keeping with the fact that JM was not seriously injured, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JM by Ramos on March 28, 2024, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(xii)   On June 2, 2024, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured as a result of the accident. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of MR by Fonseca on June 3, 2024, Tampa Bay Therapy, Carrillo, Serra,

and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(xiii)  On August 23, 2024, an Insured named SZ was involved in an automobile accident. The contemporaneous police report indicated that SZ's vehicle was drivable following the accident. The police report further indicated that SZ was not injured as a result of the accident. In keeping with the fact that SZ was not seriously injured, SZ did not visit any hospital emergency room following the accident. To the extent that SZ experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of SZ by Fonseca on August 26, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(xiv)  On October 11, 2024, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that AC was not injured as a result of the accident. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AC by Fonseca on October 15, 2024, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(xv)  On January 17, 2025, an Insured named JQ was involved in an automobile accident. The contemporaneous police report indicated that JQ's vehicle was drivable following the accident. The police report further indicated that JQ was not injured as the result of a accident. In keeping with the fact that JQ was not seriously injured, JQ did not visit any hospital emergency room following the accident. To the extent that JQ experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JQ by Fonseca on January 22, 2025, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

123.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3",  the Defendants routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

124.    What is more, in the claims for initial examinations that are identified in Exhibits "1" – "3", the Defendants misrepresented and exaggerated the amount of time that the examining health care practitioners – typically Ramos, Leon, and Fonseca – spent performing the purported examinations.

125.    As set forth in Exhibits "1" – "3", the Defendants submitted almost all of their billing for initial examinations under CPT codes 99203 and 99204, and thereby represented that the health care practitioners who purported to perform the initial examinations spent at least 45 minutes performing the putative examinations.

126.    In fact, in the claims for initial examinations identified in Exhibits "1" – "3", neither Ramos, Leon, Fonseca, nor any other health care practitioner at the Fossi Clinics spent even 15 minutes performing the examinations, much less 30 or 45 minutes.

127.   For instance, and in keeping with the fact that the initial examinations allegedly provided through the Fossi Clinics did not take more than 15 minutes to perform, the Defendants and their associates used template forms in purporting to provide the initial examinations.

128.   The template forms that the Defendants and their associates used in purporting to provide the initial examinations set forth only a limited range of examination parameters.

129.   The only time between the examining practitioners and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

130.   These brief interviews and limited examinations did not require Ramos, Leon, Fonseca, or any other health care practitioner associated with the Fossi Clinics to spend more than 15 minutes performing the purported examinations.

131.   Moreover, the purported initial examinations in the claims identified in Exhibits "1" – "3" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the examining health care practitioners to spend more than 15 minutes performing the supposed examinations.

132.   In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants routinely misrepresented the amount of time that was spent conducting

40

the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.    Misrepresentations Regarding the Extent of Medical Decision-Making**

133.    Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

134.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

135.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

136.    For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things,

41

involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

137.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

138.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) the chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

139.    In the claims for initial examinations identified in Exhibit "1", when Del Sol Care, Del Sol Perez, and Fossi billed GEICO for putative initial examinations using CPT codes 99203, they falsely represented that the health care practitioners who purported to conduct the examinations – typically Ramos – engaged in some

42

legitimate, low complexity medical decision-making in connection with the examinations.

140.  In the claims for initial examinations identified in Exhibit "2", when Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi billed GEICO for putative initial examinations using CPT codes 99203, they falsely represented that the health care practitioners who purported to conduct the examinations – typically Leon – engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

141.  In the claims for initial examinations identified in Exhibit "3", when Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for putative initial examinations using CPT codes 99203, they falsely represented that the health care practitioners who purported to conduct the examinations – typically Fonseca – engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

142.  In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

143.  Rather, in the claims for initial examinations identified in Exhibits "1" – "3": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, patient histories, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii)

the Defendants and their associates did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and provided substantially similar, false, objectively unverifiable soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual circumstances or presentation.

144. For example:

(i) On August 25, 2022, an Insured named HR was involved in an automobile accident. The contemporaneous police report indicated HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured as a result of the accident. In keeping with the fact that HR was not seriously injured, HR did not visit any hospital emergency room following the accident. To the extent that HR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on September 1, 2022, Ramos purported to conduct an initial examination of HR at Del Sol Care. To the extent that Ramos performed the examination in the first instance, Ramos did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ramos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ramos provided HR with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither HR's presenting problems, nor the treatment plan provided to HR by Del Sol Care and Ramos, presented any risk of significant complications, morbidity, or mortality. To the contrary, HR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Del Sol Care and Ramos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to HR. Even so, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ramos engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii) On October 11, 2023, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated EM was not injured as a result of the accident. In keeping with the fact that

EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on October 12, 2023, Ramos purported to conduct an initial examination of EM at Del Sol Care. To the extent that Ramos performed the examination in the first instance, Ramos did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ramos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ramos provided EM with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither EM's presenting problems, nor the treatment plan provided to EM by Del Sol Care and Ramos, presented any risk of significant complications, morbidity, or mortality. To the contrary, EM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Del Sol Care and Ramos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to EM. Even so, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ramos engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On November 10, 2023, an Insured named KT was involved in an automobile accident. The contemporaneous police report indicated KT was not injured as a result of the accident. In keeping with the fact that KT was not seriously injured, KT did not visit any hospital emergency room following the accident. To the extent that KT experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 13, 2023, Ramos purported to conduct an initial examination of KT at Del Sol Care. To the extent that Ramos performed the examination in the first instance, Ramos did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ramos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ramos provided KT with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither KT's presenting problems, nor the treatment plan provided to KT by Del Sol Care and Ramos, presented any risk of significant complications, morbidity, or mortality. To the contrary, KT did not need any significant treatment at all as a result of

the accident, and the treatment plan provided by Del Sol Care and Ramos consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KT. Even so, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ramos engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On May 5, 2024, an Insured named KM was involved in an automobile accident. The contemporaneous police report indicated KM's vehicle was drivable following the accident. The police report further indicated that KM was not injured as a result of the accident. In keeping with the fact that KM was not seriously injured, KM did not visit any hospital emergency room following the accident. To the extent that KM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 14, 2024, Marilyn Gonzalez Gomez, A.P.R.N. ("M. Gomez") purported to conduct an initial examination of KM at Del Sol Care. To the extent that M. Gomez performed the examination in the first instance, M. Gomez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, M. Gomez did not consider any significant number of diagnoses or management options in connection with the examination. Furthermore, neither KM's presenting problems, nor the treatment plan provided to KM by Del Sol Care and M. Gomez, presented any risk of significant complications, morbidity, or mortality. To the contrary, KM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Del Sol Care and M. Gomez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KM. Even so, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that M. Gomez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)    On October 11, 2024, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that AC was not injured as a result of the accident. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on October 15, 2024, Fonseca purported to conduct an initial examination of AC at Tampa Bay

46

Therapy. To the extent that Fonseca performed the examination in the first instance, Fonseca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fonseca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fonseca provided AC with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AC's presenting problems, nor the treatment plan provided to AC by Tampa Bay Therapy and Fonseca, presented any risk of significant complications, morbidity, or mortality. To the contrary, AC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Therapy and Fonseca consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AC. Even so, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fonseca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On November 6, 2024, an Insured named EH was involved in an automobile accident. The contemporaneous police report indicated EH's vehicle was drivable following the accident. The police report further indicated that EH was not injured as a result of the accident. In keeping with the fact that EH was not seriously injured, EH did not visit any hospital emergency room following the accident. To the extent that EH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 7, 2024, Fonseca purported to conduct an initial examination of EH at Tampa Bay Therapy. To the extent that Fonseca performed the examination in the first instance, Fonseca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fonseca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fonseca provided EH with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither EH's presenting problems, nor the treatment plan provided to EH by Tampa Bay Therapy and Fonseca, presented any risk of significant complications, morbidity, or mortality. To the contrary, EH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Therapy and Fonseca consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to EH. Even so, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO

for the initial examination using CPT code 99203, and thereby falsely represented that Fonseca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)  On December 1, 2024, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured as a result of the accident. In keeping with the fact that DS was not seriously injured, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 2, 2024, Leon purported to conduct an initial examination of DS at Renew Health. To the extent that Leon performed the examination in the first instance, Leon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leon provided DS with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DS's presenting problems, nor the treatment plan provided to DS by Renew Health and Leon, presented any risk of significant complications, morbidity, or mortality. To the contrary, DS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Renew Health and Leon consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DS. Even so, Renew Health, Perez Gonzalez, Perez Diaz, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Leon engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)  On December 3, 2024, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that LA was not injured as a result of the accident. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 9, 2024, Fonseca purported to conduct an initial examination of LA at Tampa Bay Therapy. To the extent that Fonseca performed the examination in the first instance, Fonseca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

48

connection with the examination. Moreover, Fonseca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fonseca provided LA with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither LA's presenting problems, nor the treatment plan provided to LA by Tampa Bay Therapy and Fonseca, presented any risk of significant complications, morbidity, or mortality. To the contrary, LA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Therapy and Fonseca consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LA. Even so, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fonseca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On December 11, 2024, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured as a result of the accident. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 17, 2024, Leon purported to conduct an initial examination of AR at Renew Health. To the extent that Leon performed the examination in the first instance, Leon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leon provided AR with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Renew Health and Leon, presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Renew Health and Leon consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AR. Even so, Renew Health, Perez Gonzalez, Perez Diaz, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Leon engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)   On January 3, 2025, an Insured named DT was involved in an automobile accident. The contemporaneous police report indicated DT's vehicle was drivable following the accident. The police report further indicated that DT was not injured as a result of the accident. In keeping with the fact that DT was not seriously injured, DT did not visit any hospital emergency room following the accident. To the extent that DT experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 3, 2025, Fonseca purported to conduct an initial examination of DT at Tampa Bay Therapy. To the extent that Fonseca performed the examination in the first instance, Fonseca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fonseca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fonseca provided DT with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, DT's presenting problems, nor the treatment plan provided to DT by Tampa Bay Therapy and Fonseca, presented any risk of significant complications, morbidity, or mortality. To the contrary, DT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Therapy and Fonseca consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DT. Even so, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fonseca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)  On January 14, 2025, an Insured named GS was involved in an automobile accident. The contemporaneous police report indicated that GS was not injured as a result of the accident. In keeping with the fact that GS was not seriously injured, GS did not visit any hospital emergency room following the accident. To the extent that GS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 16, 2025, Fonseca purported to conduct an initial examination of GS at Tampa Bay Therapy. To the extent that Fonseca performed the examination in the first instance, Fonseca did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Fonseca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fonseca provided GS with the

false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither GS's presenting problems, nor the treatment plan provided to GS by Tampa Bay Therapy and Fonseca, presented any risk of significant complications, morbidity, or mortality. To the contrary, GS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Therapy and Fonseca consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GS. Even so, Tampa Bay Therapy, Carrillo, Serra, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Fonseca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)   On February 26, 2025, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured as a result of the accident. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on February 28, 2025, M. Gomez purported to conduct an initial examination of AG at Del Sol Care. To the extent that M. Gomez performed the examination in the first instance, M. Gomez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, M. Gomez did not consider any significant number of diagnoses or management options in connection with the examination. Furthermore, neither AG's presenting problems, nor the treatment plan provided to AG by Del Sol Care and M. Gomez, presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Del Sol Care and M. Gomez consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AG. Even so, Del Sol Care, Del Sol Perez, and Fossi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that M. Gomez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)  On March 15, 2025, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated DA's vehicle was drivable following the accident. The police report further indicated that DA was not injured as a result of the accident. In keeping

with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 17, 2025, Leon purported to conduct an initial examination of DA at Renew Health. To the extent that Leon performed the examination in the first instance, Leon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leon provided DA with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DA's presenting problems, nor the treatment plan provided to DA by Renew Health and Leon, presented any risk of significant complications, morbidity, or mortality. To the contrary, DA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Renew Health and Leon consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DA. Even so, Renew Health, Perez Gonzalez, Perez Diaz, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Leon engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)  On March 15, 2025, an Insured named YR was involved in an automobile accident. The contemporaneous police report indicated YR's vehicle was drivable following the accident. The police report further indicated that YR was not injured as a result of the accident. In keeping with the fact that YR was not seriously injured, YR did not visit any hospital emergency room following the accident. To the extent that YR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 17, 2025, Leon purported to conduct an initial examination of YR at Renew Health. To the extent that Leon performed the examination in the first instance, Leon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leon provided YR with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither YR's presenting problems, nor the treatment plan provided to YR by Renew Health and Leon, presented any risk of significant complications, morbidity, or mortality. To the

contrary, YR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Renew Health and Leon consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to YR. Even so, Renew Health, Perez Gonzalez, Perez Diaz, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Leon engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xv)     On March 19, 2025, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured as a result of the accident. In keeping with the fact that JA was not seriously injured, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 24, 2025, Leon purported to conduct an initial examination of JA at Renew Health. To the extent that Leon performed the examination in the first instance, Leon did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Leon did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Leon provided JA with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by Renew Health and Leon, presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Renew Health and Leon consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JA. Even so, Renew Health, Perez Gonzalez, Perez Diaz, and Fossi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Leon engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

145.     These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants routinely falsely

represented that the examinations entailed legitimate, low or moderate-complexity medical decision-making, when in fact they did not.

146.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

147.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

148.   As set forth above, in the claims identified in Exhibits "1" – "3", almost all of the Insureds who purportedly received treatment from the Defendants were involved in relatively minor accidents.

149.   It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

150.   It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the exact same date after their underlying automobile accident.

151.   It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at individual practices such as the Fossi Clinics.

152.   Even so, in keeping with the fact that their  putative "diagnoses" were false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the Defendants – and their associates working under their direction – frequently issued substantially identical, false "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

153.   For example:

(i)   On April 5, 2022, two Insureds – CR and MR – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, April 7, 2022. CR and MR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CR and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Diaz, Perez Gonzalez, and Fossi caused CR and MR to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)   On May 17, 2022, two Insureds – GE and ED – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, May 24, 2022. GE and ED were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GE and ED suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Diaz, Perez Gonzalez, and Fossi caused GE and ED to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii)   On June 8, 2022, two Insureds – CG and CG – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, June 10, 2022. CG and CG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CG and CG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Diaz, Perez Gonzalez, and Fossi caused CG and CG to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv)   On July 15, 2022, two Insureds – RQ and LG – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, July 18, 2022. RQ and LG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RQ and LG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused RQ and LG to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)   On September 6, 2022, two Insureds – RB and RH – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, September 16, 2022. RB and RH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RB and RH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused RB and RH to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)   On September 22, 2022, two Insureds – LM and JM – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, September 26, 2022. LM and JM were different ages, in different physical conditions,

located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LM and JM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused LM and JM to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vii)  On November 25, 2022, two Insureds – DP and VH – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, November 30, 2022. DP and VH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DP and VH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Diaz, Perez Gonzalez, and Fossi caused DP and VH to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)  On February 27, 2023, two Insureds – ER and ET – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, February 27, 2023. ER and ET were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ER and ET suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Diaz, Perez Gonzalez, and Fossi caused ER and ET to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)  On June 6, 2023, three Insureds – NB, DL, and WF – were involved in the same automobile accident. Thereafter, all three Insureds presented at Renew Health for initial examinations on the exact same date, June 7, 2023. NB, DL, and WF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NB, DL, and WF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial

examinations, Renew Health, Diaz, Perez Gonzalez, and Fossi caused NB, DL, and WF to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to each of them.

(x)     On July 24, 2023, four Insureds – DB, CB, RB, and OP – were involved in the same automobile accident. Thereafter, all four Insureds presented at Del Sol Care for initial examinations on the exact same date, July 27, 2023. DB, CB, RB, and OP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DB, CB, RB, and OP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused DB, CB, RB, and OP to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to each of them.

(xi)    On August 8, 2023, two Insureds – DC and NC – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, August 9, 2023. DC and NC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DC and NC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused DC and NC to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xii)   On August 25, 2023, two Insureds – HR and MD – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, September 1, 2023. HR and MD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HR and MD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused HR and MD to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiii)   On September 2, 2023, two Insureds – AR and RB – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, September 8, 2023. AR and RB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AR and RB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused AR and RB to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv)   On September 8, 2023, two Insureds – GP and YR – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, September 12, 2023. GP and YR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GP and YR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused GP and YR to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xv)   On October 1, 2023, two Insureds – MM and AC – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, October 2, 2023. MM and AC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MM and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused MM and AC to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvi)   On November 10, 2023, two Insureds – CT and KT – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, November 13,

2023. CT and KT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CT and KT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused CT and KT to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvii) On November 21, 2023, two Insureds – JQ and PV – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, November 27, 2023. JQ and PV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JQ and PV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused JQ and PV to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xviii) On December 8, 2023, three Insureds – YM, DM, and IR – were involved in the same automobile accident. Thereafter, all three Insureds presented at Del Sol Care for initial examinations on the exact same date, January 11, 2024. YM, DM, and IR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YM, DM, and IR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused YM, DM, and IR to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to each of them.

(xix) On February 6, 2024, two Insureds – OE and AC – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, February 7, 2024. OE and AC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that OE and AC suffered any injuries at all in their accident, the injuries were different.

Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused OE and AC to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xx)   On February 12, 2024, two Insureds – AC and MA – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, February 13, 2024. AC and MA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AC and MA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused AC and MA to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxi)   On February 25, 2024, two Insureds – GG and JS – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, February 26, 2024. GG and JS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GG and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused GG and JS to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxii)   On February 28, 2024, two Insureds – LC and VD – were involved in the same automobile accident. Thereafter, both Insureds presented at Del Sol Care for initial examinations on the exact same date, March 5, 2024. LC and VD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LC and VD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused LC and VD to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a

substantially similar course of medically unnecessary treatment to both of them.

(xxiii) On March 27, 2024, three Insureds – IA, JM, and MR – were involved in the same automobile accident. Thereafter, all three Insureds presented at Del Sol Care for initial examinations on the exact same date, March 28, 2024. IA, JM, and MR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IA, JM, and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Del Sol Care, Del Sol Perez, and Fossi caused IA, JM, and MR to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to each of them.

(xxiv) On April 13, 2024, two Insureds – YA and EZ – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, April 15, 2024. YA and EZ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YA and EZ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused YA and EZ to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxv) On April 26, 2024, two Insureds – LV and KM – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, May 1, 2024. LV and KM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LV and KM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Perez Diaz, Perez Gonzalez, and Fossi caused LV and KM to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxvi) On May 1, 2024, two Insureds – EA and RM – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, May 2, 2024. EA and RM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EA and RM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused EA and RM to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxvii) On May 7, 2024, two Insureds – JU and MD – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, May 8, 2024. JU and MD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JU and MD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused JU and MD to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxviii) On June 13, 2024, two Insureds – JR and CM – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, June 17, 2024. JR and CM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JR and CM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Perez Diaz, Perez Gonzalez, and Fossi caused JR and CM to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxix) On August 23, 2024, two Insureds – RM and SR – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Therapy for initial examinations on the exact same date, August 26, 2024. RM and SR were different ages, in different physical conditions,

located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RM and SR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Therapy, Carrillo, Serra, and Fossi caused RM and SR to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xxx) On September 29, 2024, two Insureds – DC and YE – were involved in the same automobile accident. Thereafter, both Insureds presented at Renew Health for initial examinations on the exact same date, September 30, 2024. DC and YE were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DC and YE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Renew Health, Perez Diaz, Perez Gonzalez, and Fossi caused DC and YE to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

154. These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "3", the Defendants frequently caused the issuance of substantially similar "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

155. The Defendants routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false

justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

156.    In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants routinely falsely represented that the putative examinations involved legitimate, low or moderate complexity medical decision making in order to create a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

157.    In this context, Fossi – who purported to serve as the medical director of the Fossi Clinics – did not legitimately supervise the business activities of the Fossi Clinics.

158.    Had Fossi actually supervised the business activities of the Fossi Clinics, he would – among other things – not have permitted the Fossi Clinic's billing to fraudulently misrepresent that the putative initial examinations were legitimately and lawfully performed.

159.    In the claims for initial examinations identified in Exhibits "1" – "3", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and

65

treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)    Defendants were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in violation of Florida law.

## 2.    The Defendants' Fraudulent and Unlawful Charges for Follow-Up Examinations at the Fossi Clinics

160.    In addition to the fraudulent initial examinations, the Defendants often purported to subject the Insureds in the claims identified in Exhibits "1" – "3" to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

161.    As set forth in Exhibits "1" – "3", the Defendants then billed the purported follow-up examinations to GEICO under CPT codes 99213 and 99214.

162.    In the claims for follow-up examinations identified in Exhibits "1" – "3", the charges for the follow-up examinations were fraudulent in that they misrepresented the Fossi Clinics' eligibility to collect PIP Benefits in the first instance.

163.    In fact, and as set forth herein, the Defendants never were eligible to collect PIP Benefits, inasmuch as they operated in violation of Florida law.

164.    As set forth below, the Defendants' charges for the follow-up examinations identified in Exhibits "1" – "3" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

66

### a. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

165.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

166.    The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)    Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

167.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-

up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

168.   Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination typically represents that the insured presented with problems of moderate to high severity.

169.   The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)   Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

170.   Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

171.   By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

172.   Minor soft tissue injuries such as strains and sprains almost always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" – "2" presented for their putative follow-up examinations – typically months or weeks after their minor accidents – the Insured either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

173.   By the time the Insureds in the claims identified in Exhibits "1" – "3" presented at the Fossi Clinics for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents, or their problems were minimal.

174.   Even so, in the claims for the follow-up examinations identified in Exhibits "1" – "3", the Defendants made the following misrepresentations:

(i)   When billing for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibits "1" – "3", the Defendants falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)   When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibits "1" – "3", the Defendants falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue such as sprains and strains, to the limited extent that they had any presenting problems at all.

175.   In the claims for follow-up examinations under CPT codes 99213 and 99214 that are identified in Exhibits "1" – "3", the Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for their charges for the examinations under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.   Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

176.   What is more, in the claims for follow-up examinations identified in Exhibits "1" – "3", neither Ramos, Leon, Fonseca, nor any other health care

70

practitioner associated with the Fossi Clinics took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

177.   Rather, following the purported follow-up examinations, Ramos, Leon, Fonseca – and other health care practitioners at the Fossi Clinics working at the respective Defendants' direction – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

178.   The bogus "follow-up examinations" that the Defendants purported to provide to the Insureds in the claims identified in Exhibits "1" – "3" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Fossi Clinics' offices.

**3.    The Defendants' Fraudulent and Unlawful Charges for Physical Therapy Services at the Fossi Clinics**

179.   In addition to their fraudulent and unlawful initial examinations and follow-up examinations, Defendants almost always purported to subject each of the

71

Insureds in the claims identified in Exhibits "1" – "3" to weeks of medically unnecessary physical therapy treatment.

180.    In the claims identified in Exhibit "1", Del Sol Care, Del Sol Perez, and Fossi typically billed the purported physical therapy services to GEICO under:

(i)    CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $81.38 for each round of therapeutic exercises they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $45.07 for each round of mechanical traction they purported to provide;

(iii)    CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $86.04 for each round of neuromuscular reeducation they purported to provide;

(iv)    CPT Code 97140 for putative manual therapy, typically resulting in a charge of $76.88 for each round of manual therapy they purported to provide;

(v)    CPT code 97530 for putative direct therapeutic activities, typically resulting in a charge of $87.21 for each round of direct therapeutic activities they purported to provide;

(vi)    CPT code 97010 for putative hot/cold pack treatment, typically resulting in a charge of $14.65 for each round of hot/cold pack treatment they purported to provide; and

(vii)    Health Care Common Procedure Coding System ("HCCPCS") code G0283 for putative electric stimulation treatments, typically resulting in a charge of $38.11 for each round of electrical stimulation they purported to provide.

181.    In the claims identified in Exhibit "2", Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi typically billed the purported physical therapy services to GEICO under:

(i)     CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $65.10 for each round of therapeutic exercises they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $32.62 for each round of mechanical traction they purported to provide;

(iii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $67.84 for each round of neuromuscular reeducation they purported to provide;

(iv)    CPT Code 97140 for putative manual therapy, typically resulting in a charge of $59.96 for each round of manual therapy they purported to provide;

(v)     CPT code 97035 for putative therapeutic ultrasounds, typically resulting in a charge of $28.00 for each round of therapeutic ultrasound they purported to provide;

(vi)    CPT code 97032 for putative manual electric stimulation, typically resulting in a charge of $38.12 for each round of manual electric stimulation treatment they purported to provide; and

(vii)   CPT code 97010 for putative hot/cold pack treatment, typically resulting in a charge of $10.00 for each round of hot/cold pack treatment they purported to provide.

182.   In the claims identified in Exhibit "3", Tampa Bay Therapy, Carrillo, Serra, and Fossi typically billed the purported physical therapy services to GEICO under:

(i)     CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $65.92 for each round of neuromuscular reeducation they purported to provide;

(ii)    CPT Code 97140 for putative manual therapy, typically resulting in a charge of $60.00 for each round of manual therapy they purported to provide;

(iii)    CPT code 97010 for putative hot/cold pack treatment, typically resulting in a charge of $10.00 for each round of hot/cold pack treatment they purported to provide;

(iv)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $30.00 for each round of mechanical traction they purported to provide;

(v)    CPT code 97530 for putative direct therapeutic activities, typically resulting in a charge of $138.40 for each round of direct therapeutic activities they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $138.00 for each round of therapeutic exercises they purported to provide;

(vii)    CPT code 97035 for putative therapeutic ultrasounds, typically resulting in a charge of $30.00 for each round of therapeutic ultrasound they purported to provide; and

(viii)    HCCPCS code G0283 for putative electric stimulation treatments, typically resulting in a charge of $25.20 for each round of electrical stimulation they purported to provide.

183.    In the claims for purported physical therapy services identified in Exhibits "1" – "3", the charges for the physical therapy services were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

184.    In fact, and as set forth above, the Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities, including violations of the Clinic Act, the No-Fault Law, Physical Therapy Act, and the False and Fraudulent Insurance Claims Statute.

185.    In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial

standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

186.   It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

187.   Moreover, in a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

188.   In keeping with the fact that the purported physical therapy services that were billed through the Fossi Clinics to GEICO were not medically necessary, the Fossi Clinics did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

189.   There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

190.   However, the Defendants routinely purported to provide the same handful of physical therapy "treatments" to the Insureds in the claims identified in Exhibits "1" – "3", on substantially the same schedule, without regard for the Insureds' individual circumstances.

191.   Moreover, in the claims identified in Exhibits "1" – "3", the Defendants routinely caused Insureds to immediately begin a course of physical therapy, often

within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

192.   The Defendants routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents because their putative initial examinations involved no legitimate medical decision-making and had pre-determined outcomes; because the Fossi Clinics lacked legitimate medical directors who actually performed the required duties of clinic medical directors; and because the Fossi Clinics used massage therapists and unlicensed/unsupervised individuals to perform the purported physical therapy services, in contravention of Florida law.

193.   In the claims for physical therapy services identified in Exhibits "1" – "3", Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)   the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii)   the services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals;

(iii)   the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv)   the Defendants never were eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they operated in violation of Florida law.

**D.    The Unlawful Operation of the Fossi Clinics in Violation of the Clinic Act**

194.    As part of the Defendants' fraudulent and unlawful scheme, the Fossi Clinics operated in pervasive violation of the Clinic Act.

195.    The Fossi Clinics were "clinics" within the meaning of the Clinic Act, in that they were entities "where health care services are provided to individuals and which tender[ed] charges for reimbursement for such services".

196.    However, the Fossi Clinics operated in violation of the Clinic Act in that they never had legitimate medical directors who actually performed the duties required by the Clinic Act.

197.    Because the Fossi Clinics were each health care clinics subject to the Clinic Act: (i) Del Sol Perez could not operate Del Sol Care; (ii) Diaz, Perez Gonzalez, and Perez Diaz could not operate Renew Health; and (iii) Carrillo and Serra could not operate Tampa Bay Therapy unless they obtained clinic licenses for their respective clinics, and unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

198.    However, if Del Sol Perez, Diaz, Perez Gonzalez, Perez Diaz, Carrillo, and Serra retained legitimate physicians to serve as the respective Fossi Clinics' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent scheme.

199.    Accordingly:

77

(i)     Del Sol Perez recruited Gionis, then Reales, then Shechter, then Fossi, all licensed physicians, who were willing to falsely pose as the legitimate medical directors at Del Sol Care, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii)    Diaz, Perez Gonzalez, and Perez Diaz recruited Fossi, a licensed physician, who was willing to falsely pose as the legitimate medical director at Renew Health, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(iii)   Carrillo and Serra recruited Fossi, a licensed physician, who was willing to falsely pose as the legitimate medical director at Tampa Bay Therapy, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic.

200.    Fossi was never genuinely the medical director of the Fossi Clinics and, prior to Fossi, Gionis, Reales, and Shechter were never genuinely the medical directors of Del Sol Care.

201.    Instead, from the beginning of Gionis, Reales, Shechter, and Fossi's associations with the respective Fossi Clinics, they ceded all day-to-day decision-making and oversight regarding health care services at the clinics, and the resulting billing, to Del Sol Perez, Diaz, Perez Gonzalez, Perez Diaz, Carrillo, and Serra, respectively.

202.    In keeping with the fact that Gionis, Reales, Shechter, and Fossi were never the genuine medical directors at the respective Fossi Clinics, Gionis, Reales, Shechter, and Fossi never legitimately conducted systematic reviews of the respective Fossi Clinics' billings to ensure that the billings were not fraudulent or unlawful, and

instead permitted the respective Fossi Clinics to operate in the fraudulent and unlawful manner described herein.

203.   What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Fossi – who at all relevant times was in his late 70s and early 80s – never provided legitimate, day-to-day supervision at any of the Fossi Clinics, and only occasionally was present at the respective clinics, if at all.

204.   Likewise, Gionis, Reales, and Shechter never provided legitimate, day-to-day supervision at Del Sol Care during their purported tenures at medical director there, and – in fact – only occasionally were present at Del Sol Care, if at all

205.   For instance, Del Sol Care's 2020 clinic licensing application represented that Gionis was only present at Del Sol Care once per month.

206.   Del Sol Care's 2021 clinic licensing application represented that Reales was only present at Del Sol Care once per month.

207.   Del Sol Care's 2022, 2023, and 2024 clinic licensing applications represented that Shechter and then Fossi were only present at Del Sol Care once per month.

208.   Likewise, Renew Health's 2021 and 2023 clinic licensing application represented that Fossi was only present at Renew Health once per month.

209.   In the claims identified in Exhibits "1" - "3", the Defendants falsely represented that the Fossi Clinics were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

210.    In fact, none of the Fossi Clinics were in compliance with the Clinic Act, and thus were not eligible to receive PIP reimbursement.

## III.   The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO

211.    To support their fraudulent charges, the Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

212.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law, and therefore were eligible to collect PIP Benefits in the first instance. In fact, the Defendants never were in compliance with Florida law, and never were eligible to collect PIP Benefits.

(ii)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

(iii)  The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

213.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their provision of the Fraudulent Services and their submission of charges to GEICO.

214.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

215.   For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

216.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently were never performed in the first instance.

217.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

218.   The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

219.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,700,000.00.

220.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Del Sol Care**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

221.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

222.   There is an actual case in controversy between GEICO and Del Sol Care regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

223.   Del Sol Care has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

224.   Del Sol Care has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

225.   Del Sol Care has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

226.   Del Sol Care has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

227.   Del Sol Care has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

228.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Del Sol Care has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Del Sol Perez
### (Violation of RICO, 18 U.S.C. § 1962(c))

229.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

230.   Del Sol Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

231.   Del Sol Perez knowingly conducted and/or participated, directly or indirectly, in the conduct of the Del Sol Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Del Sol Care was not eligible to receive under the No-Fault Law because: (i) Del Sol Care unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

232.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1".

233.   Del Sol Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The

predicate acts of mail fraud are the regular way in which Del Sol Perez operated Del Sol Care, inasmuch as Del Sol Care was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Del Sol Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Del Sol Care to the present day.

234.    Del Sol Care is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Del Sol Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

235.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,019,000.00 pursuant to the fraudulent bills submitted through Del Sol Care.

236.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Del Sol Perez and Fossi
### (Violation of RICO – 18 U.S.C. § 1962(d))

237.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

238.    Del Sol Care is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

239.    Del Sol Perez and Fossi were employed by, or associated with, the Del Sol Care enterprise.

240.    Del Sol Perez and Fossi have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Del Sol Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Del Sol Care was not eligible to receive under the No-Fault Law, because: (i) Del Sol Care unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

241.    Del Sol Perez and Fossi knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

242.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,019,000.00 pursuant to the fraudulent bills submitted through the Del Sol Care enterprise.

243.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION
### Against Del Sol Care, Del Sol Perez, and Fossi
### (Common Law Fraud)

244.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

245.    Del Sol Care, Del Sol Perez, and Fossi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts

from GEICO in the course of their submission of thousands of fraudulent bills through Del Sol Care for the Fraudulent Services.

246.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Del Sol Care was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

247.    Del Sol Care, Del Sol Perez, and Fossi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Del Sol Care that were not reimbursable.

248.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at

least $1,019,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Del Sol Care.

249.    Del Sol Care, Del Sol Perez, and Fossi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

250.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Del Sol Care, Del Sol Perez, and Fossi
### (Under Fla. Stat. § 501.201 et. seq.)

251.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

252.    Del Sol Care, Del Sol Perez, and Fossi are actively engaged in trade and commerce in the State of Florida.

253.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203. Del Sol Care, Del Sol Perez, and Fossi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

254.    The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Del Sol Care's  eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the

89

Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

255. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Del Sol Care, Del Sol Perez, and Fossi has been materially injurious to GEICO and its Insureds.

256. The conduct of Del Sol Care, Del Sol Perez, and Fossi was the actual and proximate cause of the damages sustained by GEICO.

257. Del Sol Care, Del Sol Perez, and Fossi's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,019,000.00.

258. By reason of Del Sol Care, Del Sol Perez, and Fossi's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Against Del Sol Care, Del Sol Perez, and Fossi**
**(Unjust Enrichment)**

259. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

260. As set forth above, Del Sol Care, Del Sol Perez, and Fossi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

261. When GEICO paid the bills and charges submitted by Del Sol Care, Del Sol Perez, and Fossi through Del Sol Care, it reasonably believed that it was legally obligated to make such payments based on Del Sol Care, Del Sol Perez, and Fossi's improper, unlawful, and/or unjust acts.

262.    Del Sol Care, Del Sol Perez, and Fossi have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Del Sol Care, Del Sol Perez, and Fossi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

263.    Del Sol Care, Del Sol Perez, and Fossi's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

264.    By reason of the above, Del Sol Care, Del Sol Perez, and Fossi have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,019,000.00.

## SEVENTH CAUSE OF ACTION
### Against Renew Health
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

265.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

266.    There is an actual case in controversy between GEICO and Renew Health regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

267.    Renew Health has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

268.    Renew Health has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

269.   Renew Health has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

270.   Renew Health has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

271.   Renew Health has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

272.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Renew Health has no right to receive payment for any pending bills submitted to GEICO.

**EIGHTH CAUSE OF ACTION**
**Against Diaz, Perez Gonzalez, and Perez Diaz**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

273.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

274.   Renew Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

275.    Diaz, Perez Gonzalez, and Perez Diaz knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Renew Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Renew Health was not eligible to receive under the No-Fault Law because: (i) Renew Health unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

276.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "2".

277.    Renew Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The

predicate acts of mail fraud are the regular way in which Diaz, Perez Gonzalez, and Perez Diaz operated Renew Health, inasmuch as Renew Health was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Renew Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Renew Health to the present day.

278.    Renew Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Renew Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

279.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,019,000.00 pursuant to the fraudulent bills submitted through Renew Health.

280.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### Against Diaz, Perez Gonzalez, Perez Diaz, and Fossi
### (Violation of RICO, 18 U.S.C. § 1962(d))

281.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

282.    Renew Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

283.    Diaz, Perez Gonzalez, Perez Diaz, and Fossi were employed by, or associated with, the Renew Health enterprise.

284.    Diaz, Perez Gonzalez, Perez Diaz, and Fossi have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Renew Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Renew Health was not eligible to receive under the No-Fault Law, because: (i) Renew Health unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the

underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

285.   Diaz, Perez Gonzalez, Perez Diaz, and Fossi knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

286.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,019,000.00 pursuant to the fraudulent bills submitted through the Renew Health enterprise.

287.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### TENTH CAUSE OF ACTION
### Against Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi
### (Common Law Fraud)

288.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

289.   Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi intentionally and knowingly made false and fraudulent statements of material fact to

GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Renew Health for the Fraudulent Services.

290.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Renew Health was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

291.   Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Renew Health that were not reimbursable.

292.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at

least $1,019,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Renew Health.

293.    Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

294.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi**
**(Under Fla. Stat. § 501.201 et. seq.)**

295.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

296.    Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi are actively engaged in trade and commerce in the State of Florida.

297.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203. Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

298.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203. Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or

commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

299.   The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Renew Health's  eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

300.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi has been materially injurious to GEICO and its Insureds.

301.   The conduct of Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi was the actual and proximate cause of the damages sustained by GEICO.

302.   Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,019,000.00.

303.   By reason of Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

## TWELFTH CAUSE OF ACTION
### Against Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi
### (Unjust Enrichment)

304.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

305.   As set forth above, Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

306.   When GEICO paid the bills and charges submitted by Diaz, Perez Gonzalez, Perez Diaz, and Fossi through Renew Health, it reasonably believed that it was legally obligated to make such payments based on Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi's improper, unlawful, and/or unjust acts.

307.   Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

308.   Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

309.   By reason of the above, Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,019,000.00.

### THIRTEENTH CAUSE OF ACTION
### Against Tampa Bay Therapy
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

310.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

311.   There is an actual case in controversy between GEICO and Tampa Bay Therapy regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

312.   Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

313.   Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

314.   Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

315.   Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

316.    Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

317.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO.

**FOURTEENTH CAUSE OF ACTION**
**Against Carrillo and Serra**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

319.    Tampa Bay Therapy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

320.    Carrillo and Serra knowingly have conducted and/or participated, directly or indirectly, in the conduct of Tampa Bay Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Tampa Bay Therapy was not eligible to receive under the No-Fault Law because: (i) Tampa Bay Therapy unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not

medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

321.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "3".

322.    Tampa Bay Therapy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Carrillo and Serra operated Tampa Bay Therapy, inasmuch as Tampa Bay Therapy was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Tampa Bay Therapy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Tampa Bay Therapy to the present day.

323.    Tampa Bay Therapy is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to

GEICO and other insurers. These inherently unlawful acts are taken by Tampa Bay Therapy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

324.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,715,000.00 pursuant to the fraudulent bills submitted through Tampa Bay Therapy.

325.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Carrillo, Serra, and Fossi
### (Violation of RICO, 18 U.S.C. § 1962(d))

326.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-220, above.

327.   Tampa Bay Therapy is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

328.   Carrillo, Serra, and Fossi were employed by, or associated with, the Tampa Bay Therapy enterprise.

329.   Carrillo, Serra, and Fossi have knowingly agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Tampa Bay Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the used of the United States mails to submit thousands of fraudulent charges on a

continuous basis for over three years, seeking payments that Tampa Bay Therapy was not eligible to receive under the No-Fault Law, because: (i) Tampa Bay Therapy unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

330. Carrillo, Serra, and Fossi knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

331. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,715,000.00 pursuant to the fraudulent bills submitted through the Renew Health enterprise.

332. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTEENTH CAUSE OF ACTION
### Against Tampa Bay Therapy, Carrillo, Serra, and Fossi
### (Common Law Fraud)

333. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

334. Tampa Bay Therapy, Carrillo, Serra, and Fossi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Tampa Bay Therapy for the Fraudulent Services.

335. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Tampa Bay Therapy was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that

106

the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

336. Tampa Bay Therapy, Carrillo, Serra, and Fossi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tampa Bay Therapy that were not reimbursable.

337. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,715,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Tampa Bay Therapy.

338. Tampa Bay Therapy, Carrillo, Serra, and Fossi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

339. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Tampa Bay Therapy, Carrillo, Serra, and Fossi
### (Under Fla. Stat. § 501.201 et. seq.)

340.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

341.   Tampa Bay Therapy, Carrillo, Serra, and Fossi are actively engaged in trade and commerce in the State of Florida.

342.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203. Tampa Bay Therapy, Carrillo, Serra, and Fossi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

343.   The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) Tampa Bay Therapy's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

344.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Tampa Bay Therapy, Carrillo, Serra, and Fossi have been materially injurious to GEICO and its Insureds.

345.   The conduct of Tampa Bay Therapy, Carrillo, Serra, and Fossi was the actual and proximate cause of the damages sustained by GEICO.

346.    Tampa Bay Therapy, Carrillo, Serra, and Fossi's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,715,000.00.

347.    By reason of Tampa Bay Therapy, Carrillo, Serra, and Fossi's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

## FIFTEENTH CAUSE OF ACTION
### Against Tampa Bay Therapy, Carrillo, Serra, and Fossi
### (Unjust Enrichment)

348.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-220, above.

349.    As set forth above, Tampa Bay Therapy, Carrillo, Serra, and Fossi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

350.    When GEICO paid the bills and charges submitted by Carrillo and Serra through Tampa Bay Therapy, it reasonably believed that it was legally obligated to make such payments based on Tampa Bay Therapy, Carrillo, Serra, and Fossi's improper, unlawful, and/or unjust acts.

351.    Tampa Bay Therapy, Carrillo, Serra, and Fossi have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Tampa Bay Therapy, Carrillo, Serra, and Fossi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

352.    Tampa Bay Therapy, Carrillo, Serra, and Fossi's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

353. By reason of the above, Tampa Bay Therapy, Carrillo, Serra, and Fossi have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,715,000.00.

## JURY DEMAND

354. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

a. On the First Cause of Action against Del Sol Care, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Del Sol Care has no right to receive payment for any pending bills submitted to GEICO;

b. On the Second Cause of Action against Del Sol Perez and Suarez-Sanchez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,019,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

c. On the Third Cause of Action against Del Sol Care, Del Sol Perez, Suarez-Sanchez, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,019,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

d. On the Fourth Cause of Action against Del Sol Care, Del Sol Perez, Suarez-Sanchez, and Fossi, compensatory damages in an amount to be determined at

trial but in excess of $1,019,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2);

e.     On the Fifth Cause of Action against Del Sol Care, Del Sol Perez, Suarez-Sanchez, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,019,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

f.     On the Sixth Cause of Action against Renew Health, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Renew Health has no right to receive payment for any pending bills submitted to GEICO;

g.     On the Seventh Cause of Action against Diaz, Perez Gonzalez, and Perez Diaz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,019,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

h.     On the Eighth Cause of Action against Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,019,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

i.     On the Ninth Cause of Action against Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,019,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2);

j.    On the Tenth Cause of Action against Renew Health, Diaz, Perez Gonzalez, Perez Diaz, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,019,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

k.    On the Eleventh Cause of Action against Tampa Bay Therapy, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Tampa Bay Therapy has no right to receive payment for any pending bills submitted to GEICO;

l.    On the Twelfth Cause of Action against Carrillo and Serra, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,715,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

m.    On the Thirteenth Cause of Action against Tampa Bay Therapy, Carrillo, Serra, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,715,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

n.    On the Fourteenth Cause of Action against Tampa Bay Therapy, Carrillo, Serra, and Fossi, compensatory damages in an amount to be determined at trial but in excess of $1,715,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2); and

o.    On the Fifteenth Cause of Action against Tampa Bay Therapy, Carrillo, Serra, and Fossi, compensatory damages in an amount to be determined at trial but in

112

excess of $1,715,000.00, together with punitive damages, costs, interest and such other

and further relief as this Court deems just and proper.

Dated:      March 13, 2026

*/s/ Max Gershenoff*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
Peter J. Henninger (FBN 1070471)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, Florida 32207
and
926 RXR Plaza
Uniondale, NY 11556-0926
Phone: (904) 791-8948
Facsimile: (904) 598-6225
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
Peter.Henninger@rivkin.com
*Counsel for Plaintiffs*